**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CHARLENE K. DEWAR,

        Plaintiff,                      Case No. 05-70704

vs.

                                         HONORABLE GEORGE CARAM STEEH
                                         HONORABLE STEVEN D. PEPE

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**

**I.    BACKGROUND**

Charlene Dewar brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Both parties have filed motions for summary judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, IT IS RECOMMENDED that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

**A. PROCEDURAL HISTORY**

Plaintiff applied for Disability Insurance Benefits ("DIB") on February 15, 2002, alleging that she was disabled as of November 23, 1999 (R. 59).[1] After Plaintiff's application was initially denied, she had a June 21, 2004, hearing before administrative law judge (ALJ) Kathryn D. Burgchardt who issued a decision on July 21, 2004, finding Plaintiff not to be entitled to a

---

[1] Plaintiff filed a previous application for DIB on August 28, 1996, that was denied by ALJ James N. Gramenos on November 23, 1999 (R. 26 - 34).

period of disability. (R. 16 - 24). On January 6, 2005, the Appeals Council denied Plaintiff's request for review. (R. 4 - 6).

## B. BACKGROUND FACTS

### 1. PLAINTIFF'S HEARING TESTIMONY

At her hearing on June 21, 2004, Plaintiff stated that she was 48 years old and had a high school education. Plaintiff lives in a house with her husband and her 11 year old daughter. (R. 168). Plaintiff's mother would stay with her approximately three times a week. Plaintiff retired from her job with Ford in May, 1997, and received some nominal payments from Ford thereafter (R. 155). Plaintiff testified that an MRI showed a bulging disc in her back that ruptured resulting in emergency surgery. Dr. Lawrence, who performed the surgery, told her that her back would never be the same and that she would have to be "extremely careful" (R. 158). Plaintiff experiences lower back pain and a stabbing sensation in the middle of her back that runs down her leg causing numbing and tingling. Plaintiff cannot sit for long periods of time and she spends the majority of the day laying down (*Id.*). Plaintiff's mother and daughter help Plaintiff with all the things she cannot do around the house. Plaintiff's back problem is her biggest problem, always giving her pain, and a couple times a month it feels like a knife is stabbing her in the back (R. 159). The continuous pain goes through her butt cheek and the lower back and tingles in the back of Plaintiff's right leg (R. 160). Plaintiff cannot put very much weight on her left side because it aggravates the pain. She finds that with a sleeping pill and pillows under her knees some of the pain is relieved and she is able to sleep (R. 160, 163 - 164). Plaintiff had to stop her therapy treatments because they made her back pain worse (R. 160). She obtains some relief from spending time in her Jacuzzi or her massaging chair.

Plaintiff testified that because of her back pain, she can only walk for a short time (10 minutes), must shift her weight when standing, can only stand for five to ten minutes, can only sit for 10 minutes at the most, and can lift no more than 10 pounds. Plaintiff has no trouble grasping with her hands (R. 161 - 162). Plaintiff watches four to five hours of television per day, reads People magazine and newspapers, occasionally smokes, rarely drinks, drives a car, and visits with her family (R. 162 - 163).

Plaintiff testified that Dr. Judy Macy treats her for her back pain and provides her with Vicodin and Neurontin (R. 164 - 165). While working for Ford Motor Company, Plaintiff worked on an assembly line and later "doing downtime, like going down through the lines and marking downtime when they were down" because the assembly line work was to strenuous for her back. After a week and a half she had to stop that work because it hurt her back too much (R. 165 - 166). Plaintiff worked on the assembly line for four and a half years packing parts of a welder machine. Prior to her job on the assembly line, Plaintiff worked as an inline operator at the same plant for seven years (R. 166 - 167). Prior to that, Plaintiff worked various jobs for Ford as a welder, on a bulldozer, and other in other capacities. Plaintiff testified that she could not work any of those jobs nor any other jobs in the plant (R. 167).

On an average day Plaintiff wakes up between 8:00 and 9:00. Plaintiff's pain was usually the worst in the morning when it is very difficult for her to straighten up. Plaintiff stated that she is either reclining or laying down for 75 percent of the day (R. 172 - 173). Plaintiff can dress and bathe herself without any trouble and does very little housework or cooking (R. 168). Plaintiff does not do the dishes or dust and will sometimes buy one or two items from the grocery store, but her husband and daughter do most of the grocery shopping. Plaintiff testified

that her husband does the majority of the yard work (R. 169).

Plaintiff, in answer to her representative's questions, clarified that she could only lift items, such as a gallon of milk, once a day, and that the Vicodin she takes makes her lightheaded and that she never drives after taking one. Plaintiff stated that she only drives two or three times a week for distances of around five miles (R. 170 - 171).

### 2. MEDICAL EVIDENCE

#### A. Medical Evidence From The Relevant Period Beginning On November 24, 1999, The Day After The Prior ALJ's Decision, Through December 31, 2001, The Date Plaintiff's Insured Status Expired

Plaintiff saw Dr. Judy A. Macy, M.D., on May 18, 1998, and again on September 8, 1999, for moderate to severe pain in the right side of her back radiating down her right leg into her right gluteal region and left thigh region (R. 111, 114, 121).[2] Upon both occasions Plaintiff was able to flex approximately 30 degrees and extend to 20 degrees (R. 120,121). On the latter visit she stated that she felt better with extension then flexion (R. 121). On May 18, she stated that her pain interfered with her ability to concentrate "about 50% of he time" and that she needs to lay down for 15 minutes, every 2-3 hrs. (R. 111 & 113). Plaintiff told Dr. Macy she did not think her condition had improved since her surgery (R. 121). Dr. Macy prescribed Celebrex and Darvocet and counseled her on techniques for caring for her lower back.

On November 12, 1999, Plaintiff saw Dr. Macy, complaining of shooting pain in the back of her leg and cramping in her middle back (R. 122). She also complained that she

---

[2] On a September 8, 1999, attending Physician Statement, Dr. Macy noted pain radiating down Plaintiff's right leg (R. 114), but says "left" leg in her office notes which may be an error (R.121)                    .

experienced sharp, very severe back pain about twice a week. Plaintiff said she did not think her back pain was getting worse overall, but was the same as it had been except for the sharp and severe episodes. On examination, Plaintiff's back flexion was improved to 40 degrees and she was able to extend to neutral, but with pain. The doctor diagnosed her with Lumbosacral spine pain, prescribed Darvocet and started her on Vioxx. About two months later, on January 18, 2000, Plaintiff returned to Dr. Macy's office, again complaining of pain in her low back on the right and radiating down her right side (R. 123). On examination, Plaintiff experienced pain shooting down her right leg when she flexed to 30 degrees, but was able to get relief from her pain when she extended. Dr. Macy's impression was Lumbosacral spine pain and radiculopathy. She prescribed Darvocet and Celebrex and instructed her to discontinue Vioxx, which patient reported was not helping her, and also instructed her to follow a home exercise program. She opined that Plaintiff was unable to work and recommended that she apply for Social Security Disability benefits.

On April 12, 2001, Plaintiff was hospitalized for treatment of an acute urinary tract infection, which she has had previously, during which time she was treated with antibiotics, as she had been previously, and a kidney stone was removed (Tr. 115-19). Dr. Ashwin Shah's review of systems and symptoms, showed Plaintiff to have no joint pain, neck pain or back pain (R. 116).

### B. Medical Evidence Post-dating December 31, 2001, Plaintiff's Last Date of Insured Status

On January 7, 2002, Plaintiff returned to Dr. Macy, for the first time in almost two years, complaining that her pain seemed to be increasing; she was no longer able to treat her pain with

two Darvocets per day; and she had numbness on the top of her left foot and intermittent stabbing in her middle back (R. 124). Dr. Macy reported that Plaintiff had back surgery 4 years earlier.[3] Plaintiff stated that she could walk but had pain and that makes the constant pain worse. On examination, Plaintiff had limited range of back motion, a positive straight leg raising test, difficulty arising from a seated position; but her reflexes, her hip and leg strength were all intact, she could walk, and her range of hip motion was normal. Dr. Macy reported that the Plaintiff had difficulty climbing back on to the examining table because of her back pain. In addition to the Darvocet and Aleve she had already been taking, Dr. Macy started Plaintiff on Flexeril, Skelaxin and Vicodin, and instructed her in techniques for lower back care.

Back x-rays taken on January 9, 2002, showed "fairly advanced degenerative changes with some narrowing" at L4-5 (R. 129). An MRI scan performed on the same day showed degenerative disk disease and herniation at L4-5 with encroachment upon the anterior thecal sac and the neural foramina bilaterally (R. 127-28). The rest of the intervertebral disc heights and hydrations were normal. A hemangioma was seen in the vertebral body of T12, demonstrating hyperintensity in both T1 and T2 weighted images (R. 127).

In March 2002, Susan M. Shaughnessy, a medical examiner for the state agency, reviewed the medical record and adopted the limitations from the prior ALJ's November 23, 1999, decision (R. 130 - 37). She found Plaintiff was limited to work that permitted a sit/stand option every 30 minutes and did not involve occasional lifting/carrying of more than 15 pounds, frequent lifting/carrying of objects weighing more than 10 pounds, sitting for more than a total of

---

[3] As noted by ALJ Burgchardt (R. 18) there is some confusion whether the surgery was in May 1995 (R. 114) or in 1998 (R. 124). The 1999 ALJ decision was also uncertain about the surgery date, thinking it was May, 1998. (R. 28).

four hours, standing/walking for more than a total of four hours, only occasionally climbing, balancing or stooping and never kneeling crouching or crawling, and may not work around environmental hazards such as heights and machinery .

On September 12, 2003, Plaintiff underwent an MRI of her lumbar spine. Dr. Macy's impression was degenerative disc disease and post-surgical changes at L4 - 5 and anular disk bulge at L3 - 4 (R. 147 - 149).

In a questionnaire dated May 10, 2004, Dr. Macy indicated that Plaintiff's diagnoses were lumbosacral radiculopathy and status post surgery (R. 139). She noted that Plaintiff had back surgery "4 years ago" which would have been in 2000 (R. 141). Dr. Macy reported that Plaintiff's condition resulted in nerve root compression which caused low back and right leg, thigh and gluteal area pain (R. 139). Plaintiff had positive straight leg raising in a sitting position, flexion at 30 degrees and extension at 20 degrees, and was in constant pain (R. 140 - 141). Dr. Macy checked "yes" in response to a question asking whether Plaintiff's symptoms and limitations existed at the same or similar degree of severity since November 24, 1999 (R. 142). She rated Plaintiff's impairment as "moderately severe," which was defined on the form as an impairment that "seriously affects ability to function" (R. 143). Dr. Macy indicated that Plaintiff would only occasionally (or, "0-33% of the time") have pain that interfered with her ability to maintain attention and concentration, but that her pain would interfere with her ability to maintain reliable attendance. The doctor also commented that Plaintiff needed the option to lie down without restriction and noted that she lays down 4 to 5 times a day (R. 144). She further noted that Plaintiff could do "very little" lifting and carrying, could stand only 15 to 20 minutes at a time, could sit for only 15 to 20 minutes at a time, could do no climbing, kneeling,

balancing, crawling, and rarely could stoop or crouch (R. 145 - 46).

Plaintiff's June 1, 2004, Medications form states that she takes: "Tylenol twice a day for pain, if pain continues or gets worse I go back to Vicodin," (R. 108).

### 3. VOCATIONAL EVIDENCE

Vocational expert (the "VE") Luann Castellana characterized Plaintiff's past work as unskilled and generally light (R. 175). The first hypothetical posed to VE Castellana involved: an individual of the same age, education, and work experience as Plaintiff; who could lift or carry about 15 pounds frequently; lift or carry a little more than 10 pounds occasionally; "could stand or walk with normal breaks for a total of four hours in an eight-hour workday, at least two hours in an eight-hour workday, and this individual could sit with normal breaks for a total of about four hours in an eight-hour workday or at least -- or less than six hours in an eight-hour workday"; must be able to alternate from sitting to standing about every 30 minutes; must avoid unprotected heights, moving machinery, and vibrations; can occasionally climb, balance, and stoop, but may never crouch, kneel, or crawl (*Id.*).

VE Castellana testified that the hypothetical worker could not return to any of Plaintiff's past employment. (R. 176). VE Castellana noted that the hypothetical worker was suited for jobs at the unskilled light level that allow a sit/stand option and identified the following light exertional positions in the region of southeast Michigan:

>   1,500 protective service/security type jobs
>   2,000 assembly jobs
>   1,000 inspecting, checking, and sorting jobs
>   1,500 packer type jobs
>   2,000 cashier type jobs

(*Id.*).

She testified further that changing the lifting to 20 pounds frequently instead of 15 pounds frequently did not change her findings (*Id.*).

ALJ Burgchardt then modified the hypothetical by restricting the hypothetical individual to lifting no more than 10 pounds frequently and less than 10 pounds occasionally (R. 177). VE Castellana responded that with the modified restrictions to the unskilled sedentary jobs, that would eliminate the cashier jobs and reduce by 500 the packaging jobs leaving:

> 1,500 security/protective service jobs
> 1,000 checking, inspecting and sorting jobs
> 1,000 packaging jobs
> 2,000 assembly jobs

(R. 177).

ALJ Burgchardt again modified the hypothetical by changing the lifting ability to unable to lift even 10 pound frequently and that the individual is required to lie down or sit in a recliner for at least 75% of the work day. VE Castellana testified that there would be no jobs that the individual could do (R. 177). Plaintiff's representative then asked if a person experiencing pain that causes up to a 33 percent of lost time on a job would be able to do any of VE Castellana's listed work. VE Castellana testified that a loss of one third of a person's work day would be preclusive of all the jobs she listed (R. 178).

### 5. THE ALJ'S DECISION

ALJ Burgchardt found that Plaintiff met the disability insured status requirements from November 24, 1999, through December 31, 2001, and that she has not engaged in any disqualifying substantial gainful activity throughout that period. She found that the Plaintiff

9

suffers from severe impairments including: "L5 radiculopathy; chronic pain; and status-post surgery" (R. 23).

These impairments did not meet or equal one of the listed impairments in Appendix 1 to Subpart P, Regulations No. 4. ALJ Burgchardt also found the Plaintiff's allegations regarding her limitations to lack credibility.

Based on consideration of the entire record ALJ Burgchardt found the Plaintiff to have the residual functional capacity to lift and carry 15 pounds occasionally and 10 pounds frequently. She can sit for four hours in an eight-hour day and stand/walk for four hours out of eight hours. She must be allowed to alternate between sitting and standing every 30 minutes and must avoid unprotected heights, moving machinery and vibrations. She can occasionally climb, balance and stoop, but cannot crouch, kneel or crawl. Therefore, the Plaintiff is unable to perform any of her past relevant work.

ALJ Burgchardt also found that the Plaintiff falls in the "younger" category and has a high school education. Using Medical-Vocational rules 201.21 and 202.20 as a framework for decision-making she found that even with the Plaintiff's limitations, there are still "a significant number of jobs in the national economy that she could have performed prior to December 31, 2001" (*Id.*). Therefore the Plaintiff was not disabled under the Social Security Act at any time from November 24, 1999, through December 31, 2001, and was not entitled to a period of disability or DIB under Sections 216(I) and 223. (R. 24).

**II. ANALYSIS**

**A. STANDARDS OF REVIEW**

In adopting federal court review of Social Security administrative decisions, Congress

limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry their burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than their past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[4] A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

### B. FACTUAL ANALYSIS

Plaintiff raises two challenges to the Commissioner's decision: (1) ALJ Burgchardt erred

---

[4] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

in assessing Plaintiff's RFC; (2) ALJ Burgchardt erred by finding that Plaintiff is capable of performing a significant number of jobs in the national economy. In support of these challenges, Plaintiff argues that ALJ Burgchardt gave improper weight and insufficient deference to Plaintiff's treating physician, Dr. Macy, and did not have substantial evidence to conclude that Plaintiff was capable of a significant range of work.

Generally, under 42 U.S.C. § 405(g), the findings of ALJ Burgchardt are conclusive if they are supported by substantial evidence. Accordingly, the court's "review is limited to determining whether there is substantial evidence in the record to support the findings." *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 851 (6th Cir. 1986). In addition, it is for the Secretary to resolve conflicts in the evidence and to decide questions of credibility. *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987). The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion and substantial evidence standard presupposes that there is a "zone of choice" within which the Secretary may proceed without interference from the courts. *Mullen*, 800 F.2d at 545.

Here, a review of the record demonstrates that ALJ Burgchardt's opinion is supported by substantial evidence and should be upheld. *See Studaway v. Sec'y of HHS*, 815 F.2d 1074 (6th Cir. 1987). ALJ Burgchardt's weighing of the evidence was within her broad discretion as fact finder. ALJ Burgchardt based her decision on the medical records and opinions of Plaintiff's treating physician as well as Plaintiff's lack of regular medical treatment, her use of mostly over-the-counter medication (Tylenol) and her hearing testimony. Here, the evidence from these other sources are substantial under the *Duncan* standard and therefore ALJ Burgchardt's decision was reasonable based on the evidence before her and should be upheld. (R. 18 - 21).

Plaintiff argues that Dr. Macy's opinion was not given controlling weight and therefore ALJ Burgchardt's opinion should be over turned. A treating doctor's opinion that a patient is disabled does not have controlling weight in a social security case on the ultimate issue of disability which is reserved to the administrative decision maker. *See* 20 C.F.R. § 404.1527(e) ("Opinions on some issues . . . are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner"); § 404.1527(e)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled"); § 404.1527(e)(3) ("We will not give any special significance to the source of an opinion on an issue reserved to the Commissioner"); *see also Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) ("[A] claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work").

Finally, Plaintiff contends ALJ Burgchardt did not provide an analysis and explanation of the weight she actually gave to Dr. Macy's opinion. This is not true. ALJ Burgchardt clearly explained why she did not give Dr. Macy's opinion controlling weight:

> ... Dr. Macy's overall assessment would suggest the claimant is totally disabled from all work activity but this conclusion is not borne out by the objective medical evidence, the claimant's daily activities, limited use of narcotic pain relievers and normal unassisted gait. Nor does the evidence support Dr. Macy's conclusions that the claimant needs to lie down and/or rest for substantial periods during the day because of pain and/or fatigue or that her pain occasionally (1/3 of an 8-hour day) interferes with her ability to maintain attention and concentration. For all these reasons, Dr. Macy's opinion is not entitled to the controlling weight usually given to a treating physician.

(R. 20 - 21).

These conclusions relate to ALJ Burgchardt's noting that Plaintiff's daily activities consisted of light housecleaning, cooking, shopping for groceries, driving, taking her daughter to

13

dance class and siting and watching her dance visiting parents and others. She noted at the time of the hearing Plaintiff was taking two over-the-counter Tylenols a day for pain and only using 1 or 2 prescription Vicodin when the pain was worse. (R. 20 referring to R. 108). In addition ALJ Burgchardt believed that Plaintiff's paying bills, handling finances, using a computer (Ebay) reading, watching a lot of television and movies was inconsistent with significant concentration problems (R. 20). These references do build a logical bridge from the record evidence to the ALJ's reasons for discounting Plaintiff's credibility as to the degree of her limitations. In this case, the objective findings here are sufficient to meet the first part of the *Duncan* test [5] but the objective evidence does not answer the second question on the degree of severity that can reasonably be expected from Plaintiff's back condition. The answer to that question must depend on clinical data, including Plaintiff's statement of severity and frequency. It is this same evidence upon which Dr. Macy's opinion necessarily is based and upon which it depends. While reasonable minds might weight the evidence of record differently, this is not a case that warrants this Court imposing a different weighting as a matter of law. ALJ Burgchardt's reasoning and her findings fall within that "zone of choice" in which courts are not entitled to disturb the Commissioner's ultimate decision. If there are sufficient legitimate reasons for discounting a claimant's credibility, this serves as a sufficient reason to discount the opinion of a treating

---

[5] *Duncan v. Secretary of HHS*, *supra,* 801 F.2d at 853:
>our analysis under the new standard is essentially two-pronged. . . . .
>First, we examine whether there is objective medical evidence of an
>underlying medical condition. If there is, we then examine: (1) whether
>objective medical evidence confirms the severity of the alleged pain
>arising from the condition; or (2) whether the objectively established
>medical condition is of such a severity that it can reasonably be
>expected to produce the alleged disabling pain.

source whose opinion is based on claimant's reports of symptoms and their severity.[6]

### III.   RECOMMENDATION:,

Accordingly, for the above stated reasons IT IS RECOMMENDED that Defendant's motion be GRANTED and Plaintiff's motion be DENIED.

The parties to this action may object to and seek review of this report and recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C.. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985);  *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this report and recommendation. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

SO ORDERED.

Dated: March 31, 2006                                             s/Steven D. Pepe
Ann Arbor, Michigan                                              UNITED STATES MAGISTRATE JUDGE

---

[6] *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999) (upholding ALJ's opinion which rejected a treating physician's exertional limitation finding because it was based solely on the claimant's statement to the doctor).

<u>Certificate of Service</u>

    I hereby certify that a copy of this Report and Recommendation was served upon the attorneys of record by electronic means on March 31, 2006.

                                                  <u>s/William J. Barkholz</u>
                                                  Courtroom Deputy Clerk